UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

HEATHER LYNN HALL                    CASE NO.  6:19-CV-00861

VERSUS                               JUDGE JUNEAU

U S COMMISSIONER SOCIAL              MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be REVERSED AND REMANDED for further administrative action.

## Administrative Proceedings

Claimant, Heather Hall, fully exhausted her administrative remedies before filing this action in federal court. She applied for disability insurance benefits (SSDI) and supplemental security income benefits (SSI), and in January 2010, she was found disabled beginning on August 15, 2006. (Rec. Doc. 7-1, p. 73-75). It was later determined that she was no longer disabled as of August 12, 2014. (Rec. Doc. 7-1, p. 85-88; 95-102). A State Disability Hearing Officer upheld the termination of benefits (Rec. Doc. 7-1, p. 134-136), and Claimant requested a hearing before an Administrative Law Judge (ALJ). She appeared and testified at a hearing on March

9, 2018 before ALJ Carolyn Smilie. (Rec. Doc. 7-1, p. 40-71). ALJ Smilie upheld the termination of benefits on August 10, 2018. (Rec. Doc. 7-1, p. 19). Claimant requested that the Appeals Council review the ALJ's decision, but the Appeal Council found no basis for review. (Rec. Doc. 7-1, p. 8-10). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review.[1] Claimant then initiated this action, seeking review of the Commissioner's decision.

### Summary of Pertinent Facts

Claimant was born on November 28, 1977. (Rec. Doc. 7-1, p. 46). She was 28 years old on the alleged disability onset date and 40 years old at the time of the ALJ's adverse decision at issue. She graduated high school and attended training school for physical therapy technician. (Rec. Doc. 7-1, p. 47).

At the March 2018 hearing, Claimant testified that she was found disabled in 2010 following complications from the 2006 surgical removal of a tumor in her L5-S1 vertebrae. She testified that the tumor was nine centimeters, and that, due to the complications, she had to use a wheelchair and re-learn how to walk. (Rec. Doc. 7-1, p. 47-48). By the time of her disability determination in 2010, she testified that she had to use a walker and a cane. (Rec. Doc. 7-1, p. 48). She testified that in Spring

---

[1]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

2

2014 she woke up with excruciating pain in her hip. Three weeks later she went to the emergency room and saw her doctor, who observed a deformity of some kind. From then on, her walking changed because of her hips and legs. She testified that she could not feel the lower half of her body, and that she fell multiple times. (Rec. Doc. 7-1, p.48-50). Since that time, she had not gone anywhere without using a rollator, which she acquired in August 2014. She uses it on a daily basis, because she has severe pain in her lower back where the tumor was removed, she physically cannot move her legs, and she falls. (Rec. Doc. 7-1, p. 50). She also sits on the rollator because she has trouble transferring from a sitting position in a regular chair to standing. (Rec. Doc. 7-1, p. 51). She spends most of her time in her bed, which has a massage setting. (Rec. Doc. 7-1, p. 52). She relies on her brother and a friend to assist with things such as grocery shopping, as her doctor, Dr. Patrick Moore, told her she was unable to drive. (Rec. Doc. 7-1, p. 53).

Claimant testified that she also suffers from pain in her shoulders and arms and that her hands shake, which affects her ability to do things such as wash her hair. (Rec. Doc. 7-1, p. 54-56). In addition, the inability to move her legs results in irritable bowel syndrome accidents, because she cannot get to the restroom in time. Thus, she must wear disposable underwear. (Rec. Doc. 7-1, p. 56-58).

In his initial finding in favor of claimant in January 2010, ALJ Michael Wahlder made the following factual findings:

- At that time, Claimant had a progressive onset of polyarthritis and suffered from generalized arthritis, osteoarthritis, and rheumatoid arthritis.

- In 2006 she was diagnosed with chondroblastoma of the left sacrum, for which she underwent surgical resection of the osteochondroma. She reported to the emergency room twice thereafter for wound drainage and draining seroma. On one occasion she was admitted and treated with antibiotics for a large ecchymotic area from the incisional site.

- Thereafter she underwent physical therapy. Her healing period was complicated by the onset of grand mal seizure in August 2007, high blood pressure, and the development of a spur and cyst on her foot which had to be surgically removed.

- A February 2008 thoracic MRI showed focal left paracentral disc herniation at T6-7 without cord compression, central canal or foraminal stenosis.

- In September 2008, she was diagnosed with bipolar disorder and anxiety attended by panic attacks due to her chronic pain syndrome and significant functional limitations.

(Rec. Doc. 71-1, p. 81).

Medical records subsequent to ALJ Wahlder's findings, submitted as evidence in these proceedings, reveal as follows:

- July 30, 2012 – Dr. James Lipstate at Lafayette Arthritis and Endocrine diagnosed fibromyalgia and arthritis. He noted a past extensive medical history, and opined that she needed to find better balance in her life, as she had become a hostage to her symptoms. (Rec. Doc. 7-2, p. 68-73).

- June 12 through August 15, 2012 – Dr. David Maraist at Southwest Neuroscience Center treated her for bilateral foot pain and diagnosed her with tenosynovitis of the foot/ankle with pain with palpation of the EHL tendon area of the foot, parethesias, exostosis, bone with painful bony prominence with associated painful skin lesion. She told Dr. Maraist that her foot pain was so bad it made her fall at times. A nerve conduction study was normal. A July 19, 2012 MRI of the right foot revealed a small tubular structure over the dorsal base of the 1st metatarsal, possibly a ganglion cyst or vascular structure. Custom orthotics were recommended. She was given an injection in the EHL tendon and referred to pain management. (Rec. Doc. 7-2, p. 75-95).

- On September 12-16, 2013, Claimant presented to the Our Lady of Lourdes emergency room for a urinary tract infection. The ER doctor noted that she had one of the most complex past medical histories of anyone he had seen for her age. (Rec. Doc. 7-2, p. 12). Dr. Barrios in follow-up noted a strong family history for GI issues and inflammatory bowel disease, in addition to her notable medical history. (Rec. Doc. 7-2, p. 16-17). A subsequent GI consult

5

confirmed redundant spastic colon. (Rec. Doc. 7-2, p. 16-24). Prior medical records confirm the presence of ongoing gastrointestinal issues. (See e.g. Rec. Doc. 7-2, p. 51-63; 96-97). A CT of her abdomen/pelvis revealed no acute abnormalities and sigmoid colon diverticulosis. (Rec. Doc. 7-2, p. 156).

- March 26, 2014 – Claimant presented to the Our Lady of Lourdes emergency room for hip pain. Pelvic xrays revealed old chronic appearing bony changes of the left sacrum and iliac bone with fusion of sacroiliac joint; and no soft tissue abnormalities. (Rec. Doc. 7-2, p. 126-28). She was discharged with a diagnosis of hip pain. (Rec. Doc. 7-2, p. 134)

- May 29, 2014 – Claimant again presented to the emergency room with complaints of chronic pelvic and left hip pain. Examination showed normal range of motion and strength without tenderness, swelling or deformity. (Rec. Doc. 7-2, p. 121-22). After pelvic xrays showed stable appearing osseous changes at the left upper sacroiliac joint representing postsurgical change, she was diagnosed with hip arthritis. (Rec. Doc. 7-2, p. 118; 123)

- June 9, 2014 – Claimant presented to Dr. Patrick Moore for left hip pain, anxiety, dizziness, and low back pain. Dr. Moore assessed pelvic/joint pain, lumbago, anxiety, depressive disorder, not elsewhere classified, mitral valve disorders reported by patient with an order for tests to determine severity, and unspecified heart disease. Medications included Norco, Vibryd Kit, Amitiza,

Mobic, Protonix, Advair, and Glycopyrolate. Examination revealed pain and swelling of the left hip, with tingling/numbness, lower back pain, and range of motion limited secondary to pain. She also complained of anxiety and dizziness. (Rec. Doc. 7-2, p. 189-92).

- A June 13, 2014 lumbar MRI was unremarkable. (Rec. Doc. 7-2, p. 112). A pelvic MRI showed chronic post-surgical deformity of the left sacroiliac joint superiorly, approximately 13 mm smoothly marginated bony excrescence arises from the adjacent iliac wing cortex, without pathologic bone marrow edema or suspicious postcontrast enhancement; no discernible cartilage cap. Marrow signal at the bilateral hip joints was normal with no evidence of joint effusion, synovitis or fracture, and no osteonecrosis. (Rec. Doc. 7-2, p. 113).

- In a June 24, 2014 Physical Residual Functional Capacity Assessment, Dr. Joseph Michalik concluded that medical improvement had occurred and recommended light residual functional capacity with seizure precautions. (Rec. Doc. 7-2, p. 172-80).

- At a June 25, 2014 visit to Dr. Moore, Claimant complained of left hip/thigh pain, worse with going from sitting to standing, and exacerbated by sitting, standing, and lying down, as well as chest tightness. (Rec. Doc. 7-2, p. 193-95).

- At the next visit to Dr. Moore on July 9, 2014, an xray of her pelvis noted deformity of the left sacrum and pelvis suggestive of previous healed fracture without acute findings. (Rec. Doc. 7-2, p. 181). A pelvic CT noted no acute pelvic pathology, with postoperative changes seen without significant change. She complained of worsening anxiety as well as left hip pain, worse with flexion and extension, going from sitting to standing, and walking. She was unable to bear weight. She had tingling/numbness into her left leg, and limited range of motion secondary to pain. Dr. Moore prescribed Norco, Mobic, Meloxicam, and ointment for pelvic and thigh pain and chronic pain syndrome. (Rec. Doc. 7-2, p. 183; 197-98). A July 18, 2014 CT scan of her pelvis showed no acute pelvic pathology. (Rec. Doc. 7-3, p. 397).

- On July 23, 2014 Dr. Moore treated her for pelvic osteoarthritis, mitral valve disorder, and chronic pain syndrome. Her complaints remained the same. On physical examination of her hip, Dr. Moore found no swelling, redness or ecchymosis, painful range of motion, diminished strength due to pain, and that she was walking with a noticeable limp, favoring the affected side, with an antalgic, unequal step length. Labs and medications were prescribed. (Rec. Doc. 7-2, p. 200-202).

- In an August 12, 2014 psychiatric review, Dr. Kelly Ray found that Claimant suffered from depression. Although there was a reported diagnosis of

bipolarism, Dr. Ray found insufficient evidence for such diagnosis, since there were no medications or mania. Dr. Ray also found that she suffered from anxiety. The degree of limitation ranged from mild to moderate, with no episodes of decompensation. Dr. Ray concluded that her initial disability determination was based on a combination of her physical and mental issues, but that with resolution of the physical injuries, and in the absence of ongoing medications or inpatient treatment for the mental issues, a mental functioning residual capacity (MFRC) report was indicated. (Rec. Doc. 7-2, p. 204-217). On May 6, 2015, Dr. Cathy Castille affirmed Dr. Ray's August 12, 2014 conclusions. (Rec. Doc. 7-2, p. 336-39).

- On August 12, 2014, Claimant was notified of the cessation of benefits. Rec. Doc. 7-1, p. 85-86). The following day, she requested a Rolador-Walker (hereinafter referred to as a "rollator") prescription from Dr. Moore, which he apparently provided. (Rec. Doc. 7-2, p. 238-39)

- At a September 24, 2014 visit, Dr. Moore noted pelvic/thigh pain, chronic pain syndrome, localized osteoarthrosis to pelvic/thigh region, depressive disorder, long-term use of medications. Examination revealed decreased range of motion in the left hip with tenderness over left pelvic/hip. Medications included oxycodone, atorvastatin calcium, amitriptyline, Advair inhaler, protonix, glycopyrolate (Rec. Doc. 7-2, p. 235-37). A visit on October

9

31, 2014 was similar with complaints of thoracic or lumbosacral neuritis or radiculitis, lumbago (for which she was prescribed a TENS unit), insomnia, and chronic pain syndrome, for which she was given oxycodone and gabapentin. (Rec. Doc. 7-2, p. 231-34). She continued to follow up with Dr. Moore at least once a month for issues including mixed hyperlipidemia, chronic pain syndrome, encounter for long term use of current medications, pelvic/thigh pain, and insomnia. Dr. Moore prescribed oxycodone-acephetamine to be taken with her host of other medications (Rec. Doc. 7-2, p. 223-30; 300-310). Claimant denied falls at each of the visits.

- A March 4, 2015 MRI of her left hip showed no acute pelvic pathology or significant change of the previously demonstrated chronic bony change along the posterior superior left iliac bone. The bony changes were presumably postoperative in nature and related to the prior spinal osteochondoma. There was no acute or chronic pathology identified in the left hip. (Rec. Doc. 7-2, p. 282).

- In a March 9, 2015 follow up with Dr. Moore to review her MRI results, which did not reveal any acute conditions, she requested a bone scan, but Dr. Moore referred her to orthopedic surgeon. She did not want to see Dr. Drew, an orthopedic surgeon to whom Dr. Moore referred her. (Rec. Doc. 7-2, p. 311-12). She continued to see Dr. Moore monthly with ongoing complaints of pain

in her lower back, left hip, left wrist, elbows, and knees, as well as for mitral valve disorder, unspecified heart disease, and mixed hyperlipidemia. (Rec. Doc. 7-2, p. 314-19).

- On June 9, 2015, she transitioned to care with Dr. David Muldowny at Lafayette Bone and Joint Clinic, who had initially diagnosed the osteochondroma in 2006. She had been referred to Dr. Otis Drew, who had recommended physical therapy, but she was not interested at that time. She complained of severe left anterolateral hip pain radiating into the left groin with ambulation and climbing stairs. She reported that she was unable to ambulate without a rolling walker or walking cane due to the left hip pain. She also complained of moderate low back pain with intermittent numbness in the left lateral thigh and calf. Examination of the left hip revealed no swelling, edema, or erythema of surrounding tissue, normal sensation and coordination and restricted range of motion on internal external rotation. Dr. Muldowny recommended she begin a course of physical therapy. He stated, "Even though we don't have a specific diagnosis at this point I think it will be difficult to really come up with one." (Rec. Doc. 7-2, p. 384-87).

- Beginning on June 16, 2015 Claimant began physical therapy at ACTS Occupational and Physical Therapy. The evaluation determined a decrease in functional status. The therapist noted a 2 cm leg length difference and pain

with all movements of the hip, most notably with hip extension. She had much weakness throughout the leg and hip and significant reduction in range of the motion of the hip and spine. It was also noted that she walked with a significant limp with the appearance of a shortened left lower extremity in supine as well as standing. (Rec. Doc. 7-2, p. 364-67). By the end of a month-long course, she had made some minimal improvement with hip strength and range of motion but it was not significant enough to improve her gait pattern or sit to stand transitions. She seemed to have a leg length difference, but it was also difficult to assess because she could not stand with equal weight bearing on each leg and unable to lie the leg flat on a table to assess in supine. Therapist, Rene Leblanc recommended that she return to her healthcare provider for further evaluation, as they were unable to make significant progress to warrant continued therapy due to pain with all active and passive movements and inability to tolerate weight bearing. (Rec. Doc. 7-2, p. 368-69).

- On July 7, 2015 she returned to Dr. Muldowny with acute left wrist pain and discomfort and swelling of the right ankle. She was ambulating with a rolling walker, but this was due to a prior injury to the left hip. Dr. Muldowny injected her ankle for possible lateral impingement syndrome and recommended that

she continue physical therapy for the ankle and the wrist. (Rec. Doc. 7-2, p. 388-91)

- She followed up with Dr. Muldowny on July 21, 2015 for left hip pain, the onset of which had been gradual and increasing since March 2014. She rated the pain at 9 out of 10. Dr. Muldowny stated that the previous MRI of her hip did not show any significant intra-articular hip pathology. He did an injection of her wrist for continued pain. They discussed an intraarticular injection for her hip, but Dr. Muldowny believed she needed to resolve her anemia issue first before proceeding.[2] (Rec. Doc. 7-2, p. 395-96).

- Throughout 2015, Claimant continued to treat monthly with Dr. Moore, who refilled her medications, including oxycodone. (Rec. Doc. 7-3, p. 217-20). She also treated several times with Dr. Alvarez for nausea, GERD, and reflux. (Rec. Doc. 7-2, p. 354-57). An August 26, 2015 colonoscopy and esophagogastroduodenoscopy revealed one polyp, esophagitis, hiatus hernia in the esophagus, and erosive gastritis in the stomach. (Rec. Doc. 7-2, p. 358-60).

---

[2]     In July 2015 (7-2, p. 341-53; 7-3, p. 221) Dr. Moore referred her to Women's and Children's Hospital for a blood transfusion after she was found to have a hgh of 9.6. She was diagnosed with acute microcytic hypochromic anemia of unknown etiology.

- At a September 15, 2015 follow up with Dr. Muldowny, she complained of increased hip pain at 10/10. He injected her wrist for continued pain, but otherwise he opined there was not much else they could do orthopedically until the anemia issues could be resolved by her family doctor. (Rec. Doc. 7-2, p. 399-400).

- In Fall 2015 Dr. Moore scheduled her to see Dr. Chancellor, pain management, but she stated that she was unaware of the appointment. (Rec. Doc. 7-3, p. 207; 215). During that time, Dr. Moore also prescribed Exalgo as a 24 hour abuse-deterrent, though she was allowed to continue taking Oxycodone pending insurance approval of Exalgo. (Rec. Doc. 7-3, p. 214).

- She followed up with Dr. Moore on December 8, 2015 for hip pain, insomnia, and abdominal pain. She was prescribed hydrocodone and Movantik for constipation. She denied falling. (Rec. Doc. 7-3, p. 202-04). In the December 22, 2015 visit, Dr. Moore noted that she used a walker for ambulation (Rec. Doc. 7-3, p. 200).

- A January 13, 2016 bone scan revealed degenerative uptake within the left sacrum and ilium with no scintigraphic evidence for osteomyelitis. A lumbar MRI revealed a small shallow central disc protrusion at L5-S1 without lumbar spinal canal, lateral recess, or neural foramen stenosis. She had mild degenerative facet change at L4-S1, with chronic post-operative change at the

left upper sacrum and adjacent posterior left iliac bone unchanged since prior exams. No acute pathology was identified. (Rec. Doc. 7-3, p. 381).

- Dr. Muldowny referred Claimant to Dr. Amar Kasarla for pain management on April 18, 2016.[3] At that time, Dr. Kasarla noted a spontaneous onset of hip pain in 2014. The report indicated she could ambulate by using a walker and that she was antalgic with diminished weight bearing on the left leg. She had reduced range of motion and moderate pain with left and right lumbar rotation, flexion, and extension. The strength in her legs was 5/5 in all categories, except for on the left for hip flexion, which was 4/5. The straight leg raise in sitting position was negative at 80 degrees bilaterally. The Patrick's-FABER Test was positive on the left and negative on the right. Fibromyalgia screening was positive. Dr. Kasarla diagnosed sacroiliitis, left trochanteric bursitis, fibromyalgia, and lumbar HNP, for which he ordered an MRI and prescribed Norco, compounded topical, Zanaflex, and Klonopin. (Rec. Doc. 7-3, p. 270-75).

- On April 25, 2016, Claimant had an initial evaluation with Dr. Donald Chancellor, oncologist. Dr. Chancellor found there was no evidence of bone

---

[3]    Although the medical records refer to Claimant as a male, the report indicates that this report and evaluation was for the Claimant.

or bone marrow cancer, but he would refer her to Oschner for evaluation per her request. (Rec. Doc. 7-3, p. 410-15)

- A May 6, 2016 lumbar MRI revealed stable shallow L5-S1 central disc protrusion, mild lower lumbar spine facet arthropathy, and stable marrow heterogeneity and medullary cavity expansion in the left half of the sacrum. (Rec. Doc. 7-3, p. 296).

- Claimant saw Dr. Amar Kasarla on May 19, 2016 for evaluation of bone pain in both hips, legs, and shoulders. The physical findings remained the same. Importantly, Dr. Kasarla stated that Claimant would undergo monitoring as she was in the high risk category III for substance abuse. He noted that previous urine drug testing results were significant in the detection of the absence of prescribed medication. She was referred for physical therapy three times a week as it was necessary to increase her strength, range of motion, endurance, mobility, and activities of daily living. She was also instructed to lose weight and stop smoking. (Rec. Doc. 7-3, p. 265-69).

- She again underwent physical therapy with ACTS on May 25, through July 28, 2016 for low back pain. At the initial visit, she walked with a walker with no heel strike, walking on her toes with a considerable limp. She had much difficulty separating hip movement from spine movement and spine movement restriction with a notable scar to her lumbar spine. She had a 2 cm

leg length difference and pain with all movements of the hip as well as much weakness throughout the left hip. Her measurements were worse than previously measured. One listed problem included "unable to maintain a normal gait on a variety of surfaces." By the end of the treatment period, she had made improvements in range of motion and strength of her lower extremities, but she remained in significant pain which limited her activity tolerance. It was recommended that she return to her healthcare provider for further evaluation. (Rec. Doc 7-3, p. 111-51).

- On April 4, through October 26, 2016 she saw Dr. Brent Rochon for heart palpitations. She was having occasional palpitations with stressful situations and was referred for an echo. Her echo showed EF>65% and no significant MVP, and her Holter monitor showed sinus rhythm. (Rec. Doc. 7-3, p. 155-68).

- On October 6, 2016 Claimant underwent an epidural steroid injection at L5-S1 and SI injection with Dr. Amar Kasarla. (Rec. Doc. 7-3, p. 263). She had trigger point injections on November 17, 2016. (Rec. Doc. 7-3, p. 279-80).

- Throughout 2017, she followed up monthly with Dr. Moore for the same ongoing issues and Dr. Alvarez for ongoing GI issues. (7-3, p. 186-89; 361; 374). An August 2017 esophagogastroduodenoscopy diagnosed her with

esophagitis, hiatus hernia in esophagus, Schatzki's ring in GE junction, and gastritis. (Rec. Doc. 7-3, p. 367).

- On November 17, 2017, Dr. Moore completed a questionnaire in response to the Social Security Analyst's request in which he opined that it was medically necessary for Claimant to use a Rollator due to unstable gait (painful) due to her hip deformity. Dr. Moore stated that she needs the device all the time, that she can only stand for less than 10 minutes. He further commented that her bilateral hip pain and osteoarthropy severely limit her ADL's and motion. (Rec. Doc. 7-3, p. 443-44).

Dr. Kenneth Ritter examined Claimant on May 6, 2014 for Disability Determinations Services. (Rec. Doc. 7-2, p. 104-106). He observed that she had a normal gait and station and a long low back scar. The range of motion of her joints was normal without redness, heat, tenderness or swelling of any joint. There was no evidence of joint abnormalities. She had negative straight-leg raises bilaterally. She was neurologically intact with normal strength and sensation. Dr. Ritter's impression noted no abnormality in the left lateral pelvic area, which ached, no symptoms of mitral valve prolapse, as had been reported, no anti-seizure medications despite a history of being told she had a seizure problem, a history of fibromyalgia, which Dr. Ritter was "in complete agreement with," and episodic asthma with ongoing cigarette smoking.

In his functional report, Dr. Ritter found that lifting/carrying, standing/walking, and sitting were not affected by the impairment, and that she could frequently climb, stoop, kneel, balance, crouch, and crawl. (Rec. Doc. 7-2, p. 107). He concluded that he would find no disability problems. (*Id.* at p. 108).

Notably, Claimant testified at the March 2018 hearing that Dr. Ritter did not conduct a physical examination, but instead he only listened to her heart and argued with her, prompting her to file a complaint against him. (Rec. Doc. 7-1, p. 58-59).

Vocational expert, Leonel Bordelon, testified at the 2018 ALJ hearing that an individual assumed to have the same qualifications and physical limitations as Claimant would qualify for telephone operator, assembler, and addresser positions; although, the percentage of assembler jobs potentially available to such individual would be less due to anticipated diminished productivity arising out of the need to shift positions. (Rec. Doc. 7-1, p. 66).

Based on Claimant's testimony, her medical records, and Mr. Bordelon's testimony, ALJ Smilie determined that Claimant was disabled pursuant to the January 21, 2010 decision (comparison point decision or "CPD"); that at the time of the CPD she suffered from multiple medically determinable impairments which rendered her incapable of performing substantial gainful activity; that she had not engaged in substantial gainful activity since that time; that the medical evidence established that she did not develop any additional impairments after the CPD

through August 12, 2014 (though the description of the impairments had changed); that medical improvement had occurred on August 12, 2014; that she had not suffered any qualifying impairment(s) since August 12, 2014; that beginning on that date she had the residual functional capacity to perform sedentary work, subject to certain exceptions; and that she is able to perform a significant number of jobs in the national economy. (Rec. Doc. 7-1, p. 24-31). Claimant now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.   Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[4]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[4]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[5]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[6]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[7]  A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[8]  Conflicts in the evidence[9] and credibility assessments[10] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[11]

## B.    Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and

---

[6]    *Id.* (citations omitted).

[7]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[8]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[9]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[10]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[11]    *Id.*

disabled, regardless of indigence.[12] SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled.[13]   A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[14]  A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[15]

---

[12]      See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[13]      42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[14]      42 U.S.C. § 1382c(a)(3)(A).

[15]      42 U.S.C. § 1382c(a)(3)(B).

### C.    Statements of Error

Claimant asserts the following statements of error:

1. At step three, the ALJ's finding that Ms. Hall does not meet the criteria of Listing 1.02(A) is not supported by substantial evidence and was not arrived at by proper application of controlling law.

2. The ALJ's residual functional capacity determination is not supported by the longitudinal medical evidence of record and was not arrived at by proper application of controlling law.

### D.    Evaluation Process and Burden of Proof

In termination cases, the Commissioner may discontinue Social Security benefits if he shows that substantial evidence demonstrates that: (1) there has been medical improvement related to an individual's ability to work, and (2) the individual is now able to engage in substantial gainful activity.[16]

### 1. Whether Claimant has reached medical improvement.

Medical improvement is any decrease in the medical severity of a claimant's impairment, which was present at the time of the most recent favorable medical decision that the claimant was or continued to be disabled.[17] The determination of a

---

[16]    42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a); *Griego v. Sullivan*, 940 F.2d 942, 943–44 (5th Cir. 1991).

[17]    20 C.F.R. § 404.1594(b)(1).

decrease in medical severity must be based on changes (i.e. improvement) in the symptoms, signs, and/or laboratory findings associated with the impairments.[18] Medical improvement is related to the ability to do work if the improvement increases the claimant's functional capacity to do basic work activities.[19] Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."[20] The ability to engage in substantial gainful activity is determined through an "objective assessment of [the] functional capacity to do basic work activities" and a consideration of vocational factors.[21]

ALJ Smilie found that the most recent favorable medical decision finding that Claimant was disabled (the CBD) was January 10, 2010. (Rec. Doc. 7-1, p. 24-31). The January 10, 2010 ruling by ALJ Wahlder found that Claimant suffered from the following severe impairments: status-post surgical resection for chondroblastoma of left sacrum, low back disorder, chronic pain syndrome, and bipolar disorder with anxiety, which were not among the listed impairments in 20 CFC Part 404, Subpart P, Appendix 1, but which caused more than minimal functional limitations. (Rec. Doc. 7-1, p. 80).

---

[18]     20 C.F.R. § 404.1594(b)(1).

[19]     20 C.F.R. § 404.1594(b)(1), § 404.1594(b)(3).

[20]     *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[21]     20 C.F.R. § 404.1594(b)(5).

In August 10, 2018, ALJ Smilie found that Claimant did not develop any additional impairments after the CPD through August 12, 2014, though the description of impairments changed to the following: residual effects of spinal surgery, degenerative disc disease of the lumbar spine, degenerative joint disease of the left hip, and chronic pain syndrome, which ALJ Smilie found caused more than minimal limitation in the claimant's ability to perform basic work activities. (Rec. Doc. 7-1, p. 24). ALJ Smilie also found that Claimant had the following physical and mental impairments which were not severe: degenerative changes of the left shoulder, fibromyalgia, hyperlipidemia, mild mitral valve regurgitation, gastritis, esophagitis, hiatal hernia, and restrictive airway disease.

ALJ Smilie found that Claimant sustained medical improvement on August 12, 2014, based on medical records showing a gradual improvement of her medical condition over time. This Court agrees that the evidence in the record shows an improvement in Claimant's condition between 2010 and 2014.

With regard to her physical issues, the extensive medical records, including multiple imaging studies, reveal no edema, ecchymosis, or other acute findings. Although Claimant continuously complained of ongoing back and hip pain, all studies (including xrays, multiple MRI's, and a bone scan) were essentially normal, with the exception of expected post-surgical changes in her back. Physical examinations were also essentially normal, with the exception of noted painful range

of motion. Her treatment has been conservative with medication and physical therapy. Further, the records support the ALJ's findings that Claimant's mitral valve, hyperlipidemia, and gastrointestinal issues are controlled without significant effect on her activities of daily living. Nevertheless, the imaging studies do show the presence of a hip deformity. (See e.g. March 26, 2014 pelvic xrays which revealed old chronic appearing bony changes of the left sacrum and iliac bone with fusion of sacroiliac joint at Rec. Doc. 7-2, p. 126-28; and June 13, 2014 lumbar MRI showing post-surgical deformity of the left sacroiliac joint at Rec. Doc. 7-2, p. 112). However, this does not mean her condition has not improved since she was initially found disabled in 2010. As discussed below, the possible presence of a hip deformity is important to the consideration of whether her current condition (albeit improved) nonetheless qualifies as a disability.

With regard to her mental impairments, ALJ Smilie found that Claimant's mental impairments cause no more than "mild limitation" in any of the four functional areas and are therefore nonsevere. There is no evidence that she currently suffers from or has been treated for bipolar disorder since the CPD. Although she has continued to complain of anxiety and depression, she has not seen a psychologist or psychiatrist. ALJ Smilie gave little weight to Dr. Kelly Ray's August 12, 2014 psychiatric review, because, as she stated in her opinion, Dr. Ray "found the claimant had a severe mental impairment." (Rec. Doc. 7-1, p. 25). Nonetheless, Dr. Ray

opined that medical improvement had occurred, and that Claimant can work with restrictions. (Rec. Doc. 7-2, p. 204). Thus, the Court finds that Claimant has sustained medical improvement with regard to her mental symptoms.

### 2. Whether Claimant is now able to engage in substantial gainful activity.

The second part of the evaluation process that must be applied to a termination case relates to the claimant's ability to engage in substantial gainful activity. In making this determination, the Commissioner utilizes a seven-step sequential analysis for the termination of a Title XVI claim, and an eight-step sequential analysis for termination of a Title II claim.[22] The analysis is basically the same except that with regard to the SSI claim under Title XVI, the performance of substantial gainful activity is not considered.

The first question to be considered is whether the claimant engaged in substantial gainful activity ("SGA"). If so, the claimant's disability has ended. The evidence supports ALJ Smilie's finding that Claimant has not engaged in substantial gainful activity.

The second question is whether the claimant has an impairment or combination of impairments that meets or equals the severity of a listed impairment. If so, the disability is continuing. ALJ Smilie found that Claimant's impairments

---

[22]    20 C.F.R. § 416.994(f) and 20 C.F.R. § 404.1594(f).

did not meet or medically equal a listing since August 12, 2014. (Rec. Doc. 7-1, p. 26). Claimant's first statement of error is that ALJ Smilie's finding in this regard is not supported by substantial evidence and was not arrived at by proper application of controlling law. (Rec. Doc. 11, p. 3). ALJ Smilie rejected Claimant's argument that her impairment met listing 1.02A because she cannot ambulate effectively. 1.02A is the following:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> ****
>
> b. What We Mean by Inability To Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1

ALJ Smilie noted, but did not rely upon exclusively, physical therapy records stating that Claimant had not met the goal of being able to ambulate without an assistance device. ALJ Smilie found this to be "just a snapshot in time of her functioning and does not indicate that she is unable to ambulate consistently." (Rec. Doc. 7-1, p. 26). She did not consider this to be an opinion on Claimant's ability to ambulate effectively, but rather that Claimant was unable to reach the goal after a short course of therapy. ALJ Smilie also relied on the lack of consistency in the records that Claimant is really unable to ambulate effectively. Although the medical records do at times show she had no complaints regarding walking and do not otherwise indicate that she was unable to walk normally (see e.g. Our Lady of Lourdes at Rec. Doc. 7-2, p. 123-34, and Dr. Moore records at Rec. Doc. 7-2, p. 189-95), other records reveal that she complained of the inability to bear weight (Rec.

Doc. 7-2, p. 198) and that she was walking with a noticeable limp, favoring the affected side, with an antalgic, unequal step length (Rec. Doc. 7-2, p. 201). Moreover, imaging studies have revealed deformity of the sacrum and pelvis. (Rec. Doc. 7-2, p. 181). Further, the medical records show that she requested a rollator, which Dr. Moore apparently prescribed, and which Dr. Moore found to be medically necessary. (Rec. Doc. 7-2, p. 238-39; Rec. Doc. 7-3, p. 443-44. See also Rec. Doc. 7-2, p. 384, wherein she told Dr. Muldowny that she was unable to ambulate without a rolling walker or walking cane due to her left hip pain). Therefore, the Court finds that the case should be remanded for a specific determination as to Claimant's ability to ambulate effectively.

The Court further finds that Claimant's medical records affirm the presence of a hip deformity. As noted above, March 26, 2014 pelvic xrays showed old chronic appearing bony changes of the left sacrum and iliac bone with fusion of sacroiliac joint (Rec. Doc. 7-2, p. 126-28), and a June 13, 2014 lumbar MRI showed post-surgical deformity of the left sacroiliac joint (Rec. Doc. 7-2, p. 112). Listing 1.02A specifically identifies deformity and chronic joint pain and stiffness with limited or abnormal motion as characters of a major joint dysfunction which could qualify as a disability. Because the record contains evidence that Claimant has a hip deformity, complained to her doctors that she could not walk without an assistive device, and was prescribed a rolling walker by her treating physician, this Court finds that the

ALJ's conclusion that Claimant does not have an impairment that meets a listing is not supported by substantive evidence in the record. This finding mandates reversal of the Commissioner's decision. Although the analysis could end here, the Court proceeds with the analysis for the sake of completeness.

The third question to be asked is whether there has been medical improvement. As explained above, this Court finds that medical improvement has occurred.

The fourth question is whether medical improvement, if found, is related to the claimant's ability to work. ALJ Smilie found that Claimant's medical improvement is related to the ability to work because it has resulted in an increase in Claimant's residual functional capacity ("RFC"), and specifically that Claimant's RFC since August 12, 2014 was less restrictive than the one she had at the time of the CPD. In her second statement of error, Claimant challenges ALJ Smilie's RFC findings. The Court has found that the ALJ erred in finding that Claimant's impairments did not meet or equal a listing. Therefore, this related finding was not supported by substantial evidence in the record. Further, as discussed below, the Court finds that remand is warranted for re-evaluation of Claimant's RFC in light of the Court's instruction to re-assess Claimant's impairments vis-à-vis Listing 1.02A.

The next two questions are used when there is a finding by the Commissioner of no medical improvement, or a finding of medical improvement not related to the claimant's ability to work. Accordingly, they are inapplicable in this case.

The seventh question is whether the claimant is able to engage in past relevant work. If so, the disability has ended. In this case, the ALJ found that Claimant had no past relevant work. Accordingly, the answer to this question cannot be used as a basis to terminate the claimant's benefits.

The final question is whether the claimant is able to perform other substantial gainful activity. ALJ Smilie found that Claimant has the residual functional capacity to perform sedentary work with the following additional exceptions: never to operate foot controls with either foot; occasionally climb ramps and stairs; occasionally balance and stoop; never climb ladders, ropes, or scaffolds; never kneel, crouch or crawl; never work at unprotected heights. (Rec. Doc. 7-1, p. 27). Because the ALJ is instructed to re-assess Claimant's impairments in relation to Listing 1.02A, the ALJ must also re-evaluate the RFC. Additionally, Claimant's second statement of error is that the ALJ's RFC is not supported by the longitudinal medical evidence of the record and was not arrived at by proper application of controlling law. (Rec. Doc. 11).

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all

relevant evidence in the claimant's record."[23] The ALJ is responsible for determining a claimant's residual functional capacity.[24]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[25]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[26]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[27]

Although a treating physician's opinions are not determinative in conducting a RFC assessment, the opinion of a treating physician who is familiar with the claimant's impairments, treatments, and responses should be accorded great weight

---

[23]     *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[24]     *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[25]     *Martinez v. Chater*, 64 F.3d at 176.

[26]     *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[27]     *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

by the ALJ in determining disability.[28] In fact, when a treating physician's opinion regarding the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give that opinion controlling weight.[29] If an ALJ declines to give controlling weight to a treating doctor's opinion, he may give the opinion little or no weight – but only after showing good cause for doing so.[30] Good cause may be shown if the treating physician's opinion is conclusory, unsupported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence.[31] Before declining to give any weight to the opinions of a treating doctor, an ALJ must also consider the length of treatment by the physician, the frequency of his examination of the claimant, the nature and extent of the doctor-patient relationship, the support provided by other evidence, the consistency of the treating physician's opinion with the record, and the treating doctor's area of specialization, if any.[32]

---

[28]     *Pineda v. Astrue*, 289 Fed. App'x 710, 712-713 (5th Cir. 2008), citing *Newton v. Apfel*, 209 F.3d at 455.

[29]     20 C.F.R. § 404.1527(c)(2).  See, also, *Loza v. Apfel*, 219 F.3d at 393.

[30]     *Thibodeaux v. Astrue*, 324 Fed. App'x 440, 443-444 (5th Cir. 2009).

[31]     *Id.*

[32]     *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Newton v. Apfel*, 209 F.3d at 456.

ALJ Smilie found that Claimant's current medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the objective medical evidence. She went on to note imaging studies which revealed no acute findings and normal outcomes of physical tests, but she also recognized that Claimant exhibited painful range of motion in the hip. ALJ Smilie gave "some weight" to Dr. Michalik's opinion that Claimant could perform light work with postural and environmental limitations; although, she found that Claimant was more limited than Dr. Michalik found her to be and gave "great weight" to his environmental limitations and other restrictions. (Rec. Doc. 7-1, p. 28).

ALJ Smilie gave "little weight" to Claimant's treating physician, Dr. Moore, who opined that Claimant required the rollator at all times to walk and stand and that she could not stand for less than ten minutes. ALJ Smilie found this to be inconsistent with Dr. Moore's treatment notes, which showed she had full strength of her extremities and full strength and range of motion in her lower back and extremities. (*Id.*)

The Court finds that ALJ Smilie's failure to give controlling weight to Dr. Moore's opinions is error. Dr. Moore has treated Claimant at least monthly for several years, while Dr. Michalik examined her once pursuant to a social security

35

evaluation. Dr. Moore's opinion that Claimant requires a rollator is supported by medical records evidencing ongoing hip pain, particularly when walking and going from sitting to standing positions, and by imaging studies confirming the presence of a hip deformity. ALJ Smilie further erred in failing to provide an acceptable basis for her RFC assessment. Because she only gave "some weight" to Dr. Machalik and "little weight" to Dr. Moore, the Court is unable to determine which opinions and medical evidence support her conclusions.  She made no attempt to reconcile the vast differences between their opinions as Claimant's ability to ambulate effectively. The Court notes that ALJ Smilie properly ignored Dr. Ritter's May 2014 opinions which concluded that Claimant was essentially normal in all respects and that she had no disability problems. (Rec. Doc. 7-2, p. 104-106). Dr. Ritter's conclusion following a single evaluation (which Claimant testified failed to include a physical examination) is uncorroborated by any medical records.

Finally, ALJ Smilie failed to consider Claimant's mental impairments, which she found to be nonsevere, in assessing RFC. (Rec. Doc. 7-2, p. 24-25). Because even nonsevere impairments must be considered, remand is warranted to re-assess Claimant's RFC.

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the

fourth sentence of 42 U.S.C. § 405(g) with instructions to again evaluate whether Claimant meets the criteria of Listing 1.02A. Specifically, the Commissioner should engage an orthopedic specialist to evaluate Claimant's ability to ambulate effectively as contemplated by 1.00B2b. The Commissioner is further instructed to re-assess Claimant's RFC in accordance with the above findings. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[33]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual

---

[33]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).


Signed in Lafayette, Louisiana, this 23rd day of June, 2020.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE